UNITED STATES of America, Appellee,

v.

Lawrence Alfred SMITH, Appellant.

No. 76–2121.

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1977.

Decided Oct. 18, 1977.

Michael A. Gross, Clayton, Mo., argued and filed brief, for appellant.

Richard E. Coughlin, Asst. U. S. Atty., argued and Barry A. Short, U. S. Atty., St. Louis, Mo., on brief, for appellee.

Before LAY and HENLEY, Circuit Judges, and MILLER, Judge.[*]

MILLER, Judge.

This appeal is from the judgment of conviction of appellant on four counts of an indictment, namely: (1) conspiring with other named and unnamed, indicted and unindicted individuals to distribute Schedule II[1] controlled drugs, (2) distributing Dilaudid,[2] a Schedule II controlled drug, and (3) possessing with intent to distribute Dilaudid, all in violation of 21 U.S.C. § 841(a)(1); and (4) carrying a firearm while committing the felony described in count (3), in violation of 18 U.S.C. § 924(c)(2). We affirm.

## BACKGROUND

In May of 1976 undercover detectives of the St. Louis County Police Department began surveillance of a home at 605 Ellwine in Lemay, Missouri. On July 1, 1976, detective Ted Zinselmeier met with Patricia House, a resident of the home at that time, and purchased four tablets of Dilaudid. Zinselmeier made several more purchases from House before determining from her that her source of drugs was Peggy Linze, also a resident of the home at 605 Ellwine, that Linze obtained the drugs from a pharmacist, and that only one other person (a man), together with House and Linze, knew who the pharmacist was. Zinselmeier made purchases of drugs from Linze on July 15, 16, 26, and August 9, 1976.

Appellant first came to the attention of police on July 26. Zinselmeier phoned Linze at about noon to arrange a drug purchase. He testified that she said that she did not have enough Dilaudid on hand to complete the deal but would have enough later after meeting with her "man" (her source of drugs). Detective McDonald fol-

lowed Linze that afternoon to a parking lot where she met appellant. Together they drove to the Del Crest Plaza Shopping Center where a police helicopter surveillance team observed them entering a building in the shopping center. That evening, Zinselmeier purchased Dilaudid from Linze.

Again, on August 25, after Zinselmeier had asked Linze whether he could purchase a large quantity of Dilaudid, she and appellant were observed meeting together. On the following day, she and appellant again met and were followed by police to the Del Crest Plaza Pharmacy in the Del Crest Plaza Shopping Center. A detective entered the pharmacy and observed the pharmacist, Bernard Kershman, hand a brown paper bag to appellant, who then handed it to Linze. That evening Zinselmeier purchased 200 tablets of Dilaudid from Linze. Appellant was observed with Linze both prior to and after the sale.

Police followed the same procedure on September 8 and 9, with Zinselmeier asking to purchase an even greater quantity of Dilaudid to force Linze to again go back to her source of drugs. Police arrested[3] Linze and appellant as they were leaving the Del Crest Plaza Pharmacy on September 9. A brown paper bag, which appellant had handed to Linze just prior to arrest, contained Dilaudid tablets. A search of appellant incident to his arrest turned up a gun in his vest pocket. Police also seized appellant's car and searched it, discovering a blank prescription pad and a list of names in which the illegal prescriptions had been filled.[4]

Appellant, Linze, House, and Kershman were indicted by a grand jury. Kershman was tried separately, Linze pleaded guilty prior to trial, and House pleaded guilty

---

[*] The Honorable Jack R. Miller, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. 21 U.S.C. § 812(b)(2).

2. Dilaudid is the trade name for hydromorphone, a hydrogenated ketone of morphine.

3. Linze was arrested pursuant to a warrant. Appellant's arrest was warrantless, although police officers were under the mistaken impression that a warrant had issued for his arrest.

4. This search was also conducted without a warrant.

after the first day of trial, leaving appellant as the only person whose guilt or innocence was determined by the jury.

## OPINION

### 1. *Probable Cause*

■ Appellant raises several issues on appeal. Initially, he argues that the district court erred in overruling his motion to suppress evidence obtained pursuant to his arrest because no warrant had issued for his arrest and no probable cause existed for believing that he had committed or was committing a felony at the time of arrest. Although the district court made no findings of fact in the suppression hearings,[5] after a careful review of the record of those hearings and considering the knowledge of the police at the time of arrest, we conclude that probable cause to arrest appellant existed.

Probable cause to arrest depends on "whether, at the moment the arrest was made, . . . the facts and circumstances within . . . [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the . . . [suspect] had committed or was committing an offense." *Beck v. Ohio, supra*, 379 U.S. at 91, 85 S.Ct. at 225. Here the police knew that Linze was a drug dealer and that appellant had been seen with Linze immediately prior to and after prearranged drug purchases by detective Zinselmeier. Also, Zinselmeier had been told by House that Linze's source was a pharmacist and that only House, Linze, and one other unidentified man knew who that pharmacist was. Appellant was observed by police from a helicopter accompanying Linze to a building in the Del Crest Plaza Shopping Center on July 26 and, on August 26 and September 9, was observed entering the Del Crest Plaza Pharmacy with Linze. Immediately prior to her trips to the shopping center Linze informed Zinselmeier that she did not have sufficient drugs to deal with him; immediately after such trips Linze sold Zinselmeier drugs. Additionally, during the drug transaction with Zinselmeier on August 26, Linze told him that if he (Zinselmeier) was arrested he should call Homer Townsley and "tell him to get hold of Larry Smith [appellant]; that Larry Smith should get in touch with Peggy."

■ The trustworthiness of the information given to police was confirmed by their own observations of Linze's and appellant's activities. After House implicated an unidentified man in the scheme, police observed an unidentified man accompanying Linze on her trips to the shopping center to obtain drugs. Linze herself implicated appellant by name to Zinselmeier on August 26. Thus, on September 9, after police had again arranged to purchase drugs from Linze, had again observed her meet with appellant, and had again seen them both enter the pharmacy and exit with a brown paper bag received from the pharmacist, it would have been reasonable to conclude that Linze and appellant were "committing an offense."[6]

### 2. *Sufficiency of the Evidence*

■ Appellant also argues that the district court erred in not directing a verdict of acquittal on all counts due to insufficient evidence. Viewing the evidence in the light

---

5. *Compare United States v. Williams*, 503 F.2d 480, 485 (8th Cir. 1974) *with Beck v. Ohio*, 379 U.S. 89, 92, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

6. Appellant has not argued the illegality of the search of his person incident to arrest or of the seizure of papers from the car he was driving at the time on any basis other than the alleged illegality of his arrest. Since we conclude that probable cause existed at the time of his arrest, that argument must fail. We also conclude that appellant's argument that the legality of his arrest was vitiated by the failure of police officers to obtain a warrant is without merit. Although obtaining an arrest warrant where practicable is to be encouraged, it is not mandatory when probable cause exists. *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

most favorable to the Government and accepting as established all reasonable inferences supporting the action of the jury, we are satisfied that the Government met its burden. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Overshon*, 494 F.2d 894, 896 (8th Cir.), *cert. denied*, 419 U.S. 853, 878, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). The evidence shows that there was an ongoing conspiracy at the home on 605 Ellwine. Appellant does not dispute this, but contends that there is insufficient evidence linking him to that conspiracy. However, it is well settled that once the existence of a conspiracy is proved, "a particular individual's participation therein may be established by evidence that otherwise seems slight." *United States v. Hutchinson*, 488 F.2d 484, 490 (8th Cir. 1973), *cert. denied sub nom. Ennis v. United States*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974); *see also United States v. Overshon, supra* at 896. Much more than "slight" evidence has been shown here.

In addition to the evidence relating to probable cause, testimony of the pharmacist whose store was in the medical building where the doctor in whose name the prescriptions were written had his office and of an employee of the Del Crest Plaza Pharmacy shows that appellant had been obtaining large amounts of prescription drugs in his own name and in the name of relatives and friends as early as March 1976.[7] A blank prescription pad and a list of names (in appellant's own hand printing) which matched the names that had been used in filling the prescriptions were found in appellant's car after his arrest.

With respect to the counts alleging both distribution and possession with intent to distribute, appellant was seen accompanying Linze on August 26 to the pharmacy where he received a brown paper bag from the pharmacist and handed it to Linze; he was seen with her immediately prior to and after the sale by Linze to Zinselmeier; and the names in appellant's own hand printing have the notation "8/25" next to them. The records seized from the pharmacy confirm that prescriptions were filled in those names for Dilaudid on August 26. Likewise, when arrested on September 9, appellant had just handed to Linze some Dilaudid tablets in containers bearing names matching those on the list having the notation "due 9/9" next to them and also matching records from the pharmacy showing that prescriptions for Dilaudid in those names had been filled that day. Finally, appellant does not deny that he was carrying a gun when arrested.

### 3. *The Motions for Severance*

Appellant's further argument of unfair prejudice to him by the introduction of evidence against House, Linze, and Kershman is based on his assertion that the evidence failed to link him conspiratorily with the others and thus stands or falls with the Government's ability to show that appellant was a part of the conspiracy. As pointed out above, the Government satisfied its burden of proof on this point, so that appellant's motions for severance were properly denied. The decision to try the alleged coconspirators together was within the sound discretion of the district court. *United States v. Johnson*, 540 F.2d 954 (8th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976). No abuse of that discretion has been shown. *United States v. Scott*, 511 F.2d 15, 18 (8th Cir.), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975).

---

**7.** Records seized from the Del Crest Plaza Pharmacy show that appellant was obtaining prescription drugs as early as January 1976 for Dilaudid in his own name and Preludin (another controlled drug) in his wife's and brother's names. The records also show consecutive transactions by appellant (for Dilaudid) and by Linze (for Desoxyn, another controlled drug) on February 20, 1976. The Government showed a total of 177 prescriptions filed in the name of appellant or his friends over a nine-month period at this *single* pharmacy; testimony indicated that additional amounts of prescription drugs were similarly obtained at other pharmacies.

#### 4. The Schreiber Testimony

Appellant next argues that the district court erred in permitting the testimony of pharmacist-instructor Schreiber regarding Schreiber's policies in refusing to fill prescriptions for certain patients, his list of the names of such patients, and the sources of information upon which that list was based. However, the only objections made by appellant's counsel to this specific testimony at trial were that it was irrelevant and immaterial—not that it was hearsay. *See* Fed.R.Evid. 103(a). As the Government points out, such testimony was relevant to the conspiracy count. Moreover, Schreiber's refusal to fill prescriptions for Linze and Blest (an unindicted coconspirator) was based on his personal knowledge and experience as a pharmacist. Thus, this argument is without merit.

#### 5. Jury Instruction Regarding Coconspirator Evidence

Finally, appellant argues that the district court erred in failing to "instruct the jury, as evidence was received and more thoroughly in its instructions upon submitting the case, that evidence peculiarly applicable to co-defendants or alleged co-conspirators should not be considered against Appellant" unless or until the Government proved that a conspiracy involving him existed.[8] However, we note that appellant did not request such an instruction at the time the evidence was received. We have studied the district court's charge to the jury concerning the conspiracy count, which covers several pages of the transcript, and are satisfied that the jurors were adequately informed that they had to initially determine that a conspiracy existed and that appellant was a part of it before they could consider acts or statements of other coconspirators in determining appellant's guilt or innocence. In view of significant and substantial independent evidence of appellant's involvement in the conspiracy, we are not persuaded that failure of the district court to *sua sponte* give a limiting instruction at the time the coconspirators' extrajudicial statements were received constituted plain error.[9] *United States v. Kelley, supra* note 8.

The judgment of conviction is affirmed.

---

8. This court intimated in *United States v. Kelley*, 526 F.2d 615, 620 n. 4 (8th Cir. 1975), *cert. denied*, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976), that the failure of a trial judge to proffer a cautionary instruction to the jury at the time extra-judicial statements of alleged coconspirators were received into evidence could result in the reversal of a conviction under some circumstances, citing *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973). *See also United States v. Graham*, 548 F.2d 1302, 1308–09 (8th Cir. 1977), where this court discussed the effect of what appellants there contended was an inadequate cautionary instruction. The court noted that this circuit had never expressly aligned itself with the mandatory cautionary instruction (at time extra-judicial statements are received in evidence) position and expressly reserved that question for another day. *Id.* at 1309, 1310 n. 4.

9. This circuit has not yet taken a position on the effect of Rule 104(a) of the new Federal Rules of Evidence and its relation to jury instruction. We note that the First Circuit, which had been a "mandatory cautionary instruction" circuit (*see United States v. Honneus*, 508 F.2d 566 (1st Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975)), has recently changed its position in light of Rule 104(a). *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).

We also note that this case is more akin to the single defendant cases of *United States v. Buschman*, 527 F.2d 1082 (7th Cir. 1976), and *United States v. Halpin*, 374 F.2d 493 (7th Cir.), *cert. denied*, 386 U.S. 1032, 87 S.Ct. 1482, 18 L.Ed.2d 594 (1967), where the Seventh Circuit characterized such a limiting instruction as "useless," than to the complex, multi-defendant cases cited by appellant.