UNITED STATES of America, Appellee,

v.

Harvey B. YOUNG, Jr., Appellant.

No. 79–1573.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1980.

Decided April 9, 1980.

Rehearing and Rehearing En Banc Denied May 1, 1980.

Lawrence J. Fleming, argued, Norman S. London, St. Louis, Mo., on brief, for appellant.

Kevin F. O'Malley, Asst. U. S. Atty., St. Louis, Mo., argued, Robert D. Kingsland, U. S. Atty. and Mitchell F. Stevens, St. Louis, Mo., on brief, for appellee.

Before STEPHENSON and McMILLIAN, Circuit Judges, and THOMAS *, Senior District Judge.

DANIEL HOLCOMBE THOMAS, District Judge.

Defendant appeals from a seven count indictment charging two counts of misapplication of bank funds in violation of Title 18, United States Code, Sections 2 and 656 and five counts of mail fraud in violation of Title 18, United States Code, Sections 2 and 1341. A trial by jury was commenced on May 25, 1979, before the Honorable John F. Nangle, District Judge, United States District Court, Eastern District of Missouri. Defendant was found guilty on all counts. We affirm the judgment of the District Court.

This case concerns alleged check-kiting activity between Harvey B. Young, Eddie C. Norman, William E. Lyman and Willie Scott during an eleven month period beginning in September 1973 and continuing through July 1974.

Norman plead guilty to mail fraud charges arising out of this kiting activity in December 1976. Lyman entered a plea of guilty thereafter. Scott was convicted by a jury of mail fraud centering on his check-kite in January 1977. Appellant, Young, was indicted in August 1978.

Because of the numerous interactions between those involved, a comprehensive review of what is a complex fact situation is necessary.

Appellant Young is a lifelong resident of Kirksville, Missouri, and President of the Bank of Kirksville, one of the lending institutions with which we are concerned.

Eddie C. Norman was the operator of the Schuyler County Sale Company, a successful cattle sale barn at which livestock was auctioned. Norman had known appellant for a period of some ten years and maintained both personal and business accounts with appellant's bank.

William E. Lyman was a commodities broker, who along with Norman and one Junior Liston, formed the Schuyler County Commodity Brokerage. The purpose of such brokerage was to act as a conduit through which appellant and others in Kirksville might play the commodities market.

Using Lyman as his broker, Norman became actively involved in the trading of futures contracts. Their initial success spawned interest by Barry Gushleff, a Kirksville osteopath and close friend of appellants, as well as appellant himself. Convinced by Norman, Gushleff and appellant that a brokerage business in northeast Missouri would be lucrative, Lyman moved from Marshalltown to Lancaster, Missouri, in the spring of 1973.

Shortly thereafter, Young, Gushleff and several professional men in Kirksville formed the Adair County Trading Club (ADCT) to pool their resources as they played the commodities market. Simultaneously, Norman, Lyman and one Junior Liston formed the Schuyler County Commodity Brokerage (SCCB). A contract was executed whereby SCCB was to handle the investments of ACTC in return for fifty percent of ACTC's profits or losses.

In the summer of 1973 Norman began experiencing serious cash flow problems. Norman approached appellant for a loan but was informed that loans were not available for such investments.

Subsequently, Young met with Norman and Lyman at the bank of Kirksville. During this meeting Young told Lyman that, "We've got to help Eddie every way we can." [1] It was then agreed that Norman and Lyman could generate a cash flow by kiting checks between Norman's accounts at the Bank of Kirksville and Lyman's

---

* The Honorable Daniel H. Thomas, Senior United States District Judge, Southern District of Alabama, sitting by designation.

1. T.T. 510.

accounts at the Schuyler County Bank in Lancaster, Missouri, and the Fidelity Savings Bank in Marshalltown, Iowa.[2]

Prior to the Norman-Lyman-Young meeting, Norman had kited checks with several other associates.[3] One such associate was Junior Liston.

During the ensuing months, Young, Norman and Lyman maintained almost daily contact.[4]

## KIRKSVILLE–SCHUYLER COUNTY KITE

Within a short period after their September meeting, Norman and Lyman began kiting checks. Norman drew checks against his account at the Bank of Kirksville while Lyman did likewise at the Schuyler County Bank in Lancaster, Missouri. On the first day of this kite in September of 1973, the opening balance of Lyman's account at the Schuyler County Bank was $224.25 and Norman's livestock account was overdrawn in the amount of $92,875.13.[5] This overdraft was immediately brought to Young's attention by FDIC personnel then examining his bank. However, on September 11, 1973, three Lyman checks, totalling approximately $95,000.00 were deposited in the Eddie Norman livestock account. The following day, September 12, 1973, two Norman checks totalling approximately $77,000.00 were deposited in Lyman's account at the Schuyler County Bank.[6] This exchange lasted but a short time before being discovered by Leo Funk, President of the Schuyler County Bank. Funk terminated the kite and personally took the Norman checks to the Bank of Kirksville for payment. Funk met with cashier Ben Graves at Kirksville whose review of Norman's account showed insufficient funds to honor the checks held by Funk. Graves informed Young of the situation and was thereafter directed by Young to issue a cashier's check to Funk in the amount of $125,219.50.[7]

Young was charged in Count I of the indictment with misapplying $68,843.77. Such an amount represents the difference between what Norman had in his account and the amount of the kited Norman checks presented by Funk and honored by Young.

## KIRKSVILLE–MARSHALLTOWN KITE

The Kirksville-Marshalltown kite began at approximately the same time as the exchange at the Schuyler County Bank, but continued through November 1973. The parties involved were once again Norman and Lyman.

In order to clear Lyman's checks deposited in Norman's account, the Bank of Kirksville would mail the checks to the Continental Illinois National Bank and Trust, its Federal Reserve correspondent bank in Chicago. On October 2, 1973, the Bank of Kirksville processed Lyman's checks in such manner by placing them in the United States mail.[8] Such actions constituted violations of mail fraud as charged in Count III of the original indictment.

As this kite approached its conclusion, Norman withdrew approximately $250,-000.00 of his equity from the commodity market and also obtained, with Young's assistance, a loan of $200,000.00 from the National Stockyards Bank. These funds were deposited in Norman's account at the Bank

---

2. Check kiting is a plan wherein one or more parties, utilizing checking accounts at two or more banks systematically exchange checks of similar amounts. Utilizing the delay or lag time as the checks are cleared through the Federal Reserve System, an inflated and uncollected balance is created and maintained at the banks. While checks drawn against uncollected funds are in the clearing process, the parties have the use of the deposited but uncollected funds, which make up the "float".

3. T.T. 178; 244–247.

4. T.T. 153; 497.

5. T.T. 472–479; Gov't. Exh. 1–1; 2–1.

6. T.T. 470–483; Gov't. Exh. 1–1 thru 1–12; 2–1 thru 2–13.

7. T.T. 115–116; 750–753; 944–945; Gov't Exh. 1–7.

8. T.T. 219; 767–769; Gov't Exh. 1–79; 3–25; 3–26.

of Kirksville and allowed the kite to end without a financial loss to either bank.

## KIRKSVILLE–GREEN CITY KITE

Lyman and Gushleff began a check-kite in January 1974.[9] Lyman used his account at the Bank of Kirksville while Gushleff employed a corporate account at the Farmers Bank of Green City, Missouri. This kite progressed through February and March of 1974.

Toward the end of this kite, Lyman and Gushleff began disputing who owed the other money. William Reed witnessed one such argument in Gushleff's office and thereafter informed Young of such a kite.[10]

A short time later Young met with Lyman and Gushleff at the Bank of Kirksville to settle their differences. Lyman was informed that he owed Gushleff approximately $18,000.00 as a result of the kite. When Lyman stated that he could not produce the needed funds, he was told by Young to sign a note for the difference.[11]

Alerted to Gushleff's account by its overdraft activity, the president of the Green City Bank, William Carr, suspected a kite and began returning Gushleff's checks, thereby terminating the exchange.

## KIRKSVILLE–WAPELLO–WEAVER– FORT MADISON KITES

In March 1974, Norman remained in debt to the Bank of Kirksville. At this time Young and Norman agreed to resume a check-kite. Norman selected Willie Scott, an Iowa livestock dealer, as the second party to the kite. Such kite progressed between Norman's accounts at the Kirksville Bank and Scott's accounts at the State Bank of Wapello, in Wapello, Iowa, and the Farmers Savings Bank in Weaver, Iowa.[12]

The Kirksville and Wapello kite lasted briefly before A. T. Wollenhaupt, an official at the Wapello bank, compared Scott's checks against his deposits and discovered the irregularities.

The final kites between Norman's accounts at appellant's bank and Scott's accounts at Weaver and the Lee County Savings Bank in Fort Madison, Iowa, lasted from March through July of 1974.

Kirksville cashier Graves determined that Norman and Scott were kiting checks, and in June of 1974, reported this to Young.[13]

Young informed Norman that Graves was angry about the kite and that Norman should cover-up the exchange in some way.[14]

The mailings of Scott checks by the Bank of Kirksville to the Continental Illinois National Bank on June 24, July 6, July 10, and July 15, 1974, comprise the mail fraud charges in Counts IV through VII of the indictment.

Young's honoring the kited checks on July 12, 1974, originated the misapplication charge in Count VIII of the indictment.

## COVER–UP

Within a short time subsequent to the termination of the kites, Young and Norman met at the Bank of Kirksville. Young assured Norman that Young could straighten out any difficulties that may have arisen and that Norman should in no manner mention Young's involvement therein.[15]

During the early stages of the investigation Young repeatedly assured Norman that Young would afford his family sufficient care and maintenance should Norman go to jail. Young continued to insist that his name not be mentioned as a participant.[16]

After Norman's indictment, Young refused to speak to Norman. Thereafter, Nor-

---

9. T.T. 555.

10. T.T. 1120.

11. T.T. 613–161.

12. T.T. 266, 273; 876.

13. T.T. 815–819; 841–842.

14. T.T. 298–299.

15. T.T. 315–316.

16. T.T. 316; 325–326; 441.

man attempted to reach Young via Young's associate, Gushleff. Norman then threatened to expose Young's involvement unless Young agreed to release Norman's debts at the Kirksville Bank. Norman also imposed demands upon Gushleff, as a condition to Norman's silence concerning Gushleff's prior kiting activities.

Gushleff later appeared before a federal grand jury, and when questioned about the facts of this case, asserted his Fifth Amendment privilege against self-incrimination.

I.  Appellant's Motion to Dismiss the Misapplication Counts of the Indictment

Appellant contests the trial court's failure to dismiss Counts I and VIII of the indictment on the grounds that they failed to state offenses. He contends that since the misapplication counts of the indictment do not use the words "with an intent to injure or defraud", that the indictment is fatally defective. Additionally, he submits that the evidence was insufficient to support these two charges. We are unable to find favor with such assertions.

■ An indictment which tracks the language of the appropriate statute, advises the defendant of the elements of the offense, appraises him of the charges, and allows him to plead a conviction or an acquittal as an impediment to subsequent prosecutions and is sufficient. *United States v. Fleming*, 526 F.2d 191, 192 (8th Cir. 1975), *cert. dismissed*, 423 U.S. 1082, 96 S.Ct. 872, 47 L.Ed.2d 93 (1976).

This Court has stated:

An indictment 'will ordinarily be held sufficient, unless [it is] so defective that by no reasonable construction can it be said to charge the offense for which the defendant [was] convicted.' *Muench v. United States*, 96 F.2d 332, 335 (1938).

*See also, United States v. Ivers*, 512 F.2d 121, 123 (1975).

■ Counts I and VIII of the present indictment assert a violation of Title 18, U.S.C. Section 656. That section provides in part:

Whoever, being an officer * * * or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank * * * willfully misapplies any of the moneys, funds or credits of such bank * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both * *

Counts I and VIII of the original indictment, in pertinent parts, read:

* * * HARVEY B. YOUNG, JR.

the defendant herein, as President of the Bank of Kirksville, Missouri, the deposits of which were then insured by the Federal Deposit Insurance Corporation, did willfully misapply and caused to be misapplied [amounts] of the money and funds of said bank * * *

The government suggests and we agree that the present indictment sufficiently traces the language of the applicable statute.

■ As to appellant's position that there exists no sufficient evidence to support Counts I and VIII, our posture is adverse. We discern an obvious violation of the misapplication statute in light of appellant's orchestration of the numerous kites herein. *United States v. Giordano*, 489 F.2d 327 (2nd Cir. 1973); *United States v. Stevison*, 471 F.2d 143 (7th Cir. 1972); *Rakes v. United States*, 169 F.2d 739 (4th Cir. 1948); cf., *United States v. Caldwell*, 544 F.2d 691 (4th Cir. 1976).

II.  The Government's Response to Appellant's Pre-Trial Request for Favorable Evidence

Prior to the trial appellant moved for production of favorable evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and requested, *inter alia*:

* * * any information whatsoever which may tend to impeach or effect the credibility of witnesses whom the Government intends to call at trial.

The Government responded that:

* * * The Government is aware of its duties under *Brady v. Maryland*, 373 U.S.

83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963) and has tendered such material to the defendant. If any further 'Brady' materials come into the possession of the Government they will immediately be tendered to the defendant without further court order.

Appellant contends that the failure of the government to provide F.B.I. reports of interviews with Dr. Barry Gushleff resulted in a violation of due process and accordingly, requires a new trial. We disagree.

Subsequent to the trial of this case, a hearing was conducted in the District Court concerning possible violations of *Brady v. Maryland, supra.* The Court held that no such violation had occurred, citing *Mullins v. United States,* 487 F.2d 581 (8th Cir. 1973). Appellant's motion for a new trial was then denied.

■ All parties agree that *Brady v. Maryland, supra,* requires the government to produce evidence favorable to the defendant. It is clear that the information must be both material and likely to effect the outcome of the trial. *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *See also, Evans v. Janning,* 489 F.2d 470, 475 (8th Cir. 1973).

While the government agrees with the proposition that the Gushleff interviews were not *per se* afforded to appellant, it rebukes any assertion of a *Brady* violation on three grounds. First: all of the information contained in the Gushleff interviews was provided to appellant in other reports in advance of trial;[17] Second: the reports and exhibits made available to appellant prior to the trial alerted him to Gushleff's knowledge of the check-kites and subsequent cover-up and extortion attempts; Third: even without the reports and exhibits provided by the government, the appellant had personal knowledge of Gushleff's role in these affairs.

■ The government is under no obligation to disclose to a defendant what he already knows. *United States v. Corey,* 566 F.2d 429, 431 n. 5 (2nd Cir. 1977); *United States v. Robinson,* 560 F.2d 507, 518 (2nd Cir. 1977); cf. *DeBerry v. Wolff,* 513 F.2d 1336, 1340 (8th Cir. 1975).

■ Inasmuch as the information deemed suppressed by appellant was in fact supplied to him under the heading of a Norman, Lyman or Young report, as opposed to a Gushleff interview, it is nothing more than an argument of form over substance and is consequently unavailing.

III. Appellant's Motion to Transfer the Trial from the Eastern Division to the Northern Division of the Eastern District of Missouri and to Strike the Jury Panel

Appellant would have us believe that he was denied his right to a fair trial when the trial court refused his request that the case be transferred to the Northern Division of the Eastern District of Missouri. As the government points out, such a claim revolves around a three-pronged basis: (1) A defendant has a right to be tried in the division in which the offense occurred; (2) A defendant has a right to have a venire panel selected from the entire district; and (3) The jury which heard this case allegedly did not represent a fair cross section of the community in which the offenses were committed.

Despite the above argument, the appellant struck from a list of prospective jurors, among others: (1) Grace Ashby, who at the time of trial lived in a small rural town, was raised on a farm, and previously did business with a small bank;[18] and, (2) Frank Breeden, who had been associated for many years with a small rural bank.[19]

Whatever the reasons for appellant's actions in striking such prospective jurors, it apparently flies in the face of any claim concerning lack of representation on the jury by a fair cross section of the community.

Regarding appellant's contention of his right to be tried in the Northern Division of the Eastern District of Missouri, we are unable to support such an assertion.

---

17. Appendix A of government's brief.

18. Supp.T.T. 9:11.

19. Supp.T.T. 8.

▮ An amendment in 1966 to Rule 18, Federal Rules of Criminal Procedure, deleted the previous requirement that a defendant be tried in the division in which the offense occurred. The rule in its present form states in part:

> * * * prosecution shall be had in a district in which the offense was committed.

This has been interpreted to mean that as long as the trial takes place within the district in which the offense took place, no error occurs. *United States v. Mase*, 556 F.2d 671, 675 (2nd Cir. 1977); *United States v. Cates*, 485 F.2d 26 (1st Cir. 1974). In *United States v. Brown*, 535 F.2d 424 (8th Cir. 1976), this Court held that there is no constitutional right to a trial within a certain division.

Appellant cites the term "vicinage" to support his argument that the jury should have been selected from the entire district. Such position is however, directly contra to *Zicarelli v. Gray*, 543 F.2d 466 (3rd Cir. 1976). The Court there found no constitutional right to have jurors drawn from an entire district.

▮ With regard to appellant's claim that the jury panel was unconstitutional because it did not consist of the same ratio of rural to urban jurors as that which exists in the Northern Division, we are unable to find support for such a position.

▮ Exclusion from the jury of persons from particular geographical areas does not violate the Sixth Amendment. *United States v. Florence*, 456 F.2d 46 (4th Cir. 1972). In that case it was noted that the Northern District of West Virginia had six separate locations for holding court, including the cities of Parkersburg and Elkens. Although the crime charged in the case occurred in Parkersburg, the indictment was returned and the trial conducted in Elkens. Members of the panel were chosen only from the counties surrounding Elkens and there were no prospective jurors from either the area where the crime was committed or where the defendant resided.

The Fourth Circuit held that since the jury came from both the state and district in which the crime had been committed, no rights of the defendant had been breached.

### IV. Appellant's Motion for a Mistrial Concerning a Comment in the Government's Closing Argument

Appellant seeks reversal of his conviction based upon a comment by the government during its closing argument concerning its refusal to call Gushleff as a witness in the case.

In response to appellant's arguments, the following two sentences were uttered by the Assistant United States Attorney and serve as the basis of appellant's motion for a mistrial:

> We talk about the Fifth Amendment. I think you can anticipate where Dr. Gushleff is.

In discussing the motion, the court noted that appellant was "given extensive leeway" in his argument without objection from the government,[20] and concluded:

> I do think, Mr. London, that you came down pretty hard in the area of failure to call witnesses, some of it, most of it, within propriety, some of it, I think, you stepped a little wide, but there was no objection, so that's the way it goes. I do not feel that Mr. O'Malley was guilty of any prosecutorial impropriety. I don't believe the problem even comes close to rising to that level.[21]

Appellant's motion for a mistrial was denied, government's counsel was cautioned not to reenter this area, and a cautionary instruction promptly given to the jury.[22]

As regards closing arguments of government counsel, this court has held that:

> The dominating question, always, is whether the argument complained of was so offensive as to deprive the defendant of a fair trial.

*Isaacs v. United States*, 301 F.2d 706, 736, *cert. denied*, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).

**20.** T.T. 1197.

**21.** T.T. 1201.

**22.** T.T. 1202–1203.

Broad discretion in the area of closing arguments is vested in the trial court. *United States v. Robinson,* 539 F.2d 1181 (8th Cir. 1976), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977).

Absent a clear abuse of that discretion, the ruling of the trial court is not to be disturbed. *United States v. Bohr,* 581 F.2d 1294 (1978), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351.

We are unable to perceive any prejudicial impact moving towards the appellant from the government's closing comments. For this reason, denial of appellant's motion for a mistrial was proper.

**V. Evidence of Similar Acts Committed by the Appellant**

Appellant argues that "massive amounts" of evidence of crimes not charged in the indictment were received at his trial and that he was prejudiced thereby. The evidence in dispute concerned a check-kite between the appellant's friend Gushleff, using the Farmers Bank of Green City, and Norman and Lyman, who both used the Bank of Kirksville. Such kite occurred after the Kirksville-Marshalltown kite, but before the Kirksville-Wapello-Weaver-Fort Madison kites.

Evidence of similar acts is admissible where there is a genuine issue as to intent, pre-conceived plan, or absence of mistake or accident. *United States v. Clemons,* 503 F.2d 486 (1974). Such evidence may be admitted if (1) an issue is raised on which evidence of other crimes may be received; (2) the proffered evidence is relevant to that issue; (3) the evidence is clear and convincing; and (4) the probative worth outweighs any prejudicial impact. *Clemons, supra* at 489; *United States v. Conley,* 523 F.2d 650, 653–654, *cert. denied,* 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976); *United States v. Cochran,* 475 F.2d 1080, 1082, *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).

It is only when the questioned evidence clearly has no bearing upon any of the issues involved, that the discretion of the trial court will be disturbed and the case reversed. *Conley, supra* at 654; *Cochran, supra* at 1082.

This court has held that where specific intent and guilty knowledge are elements of the crime charged, "evidence of related criminal activity tending to establish those elements is generally admissable." *United States v. Gocke,* 507 F.2d 820, 824 (1974).

Additionally, in accordance with *United States v. King,* 572 F.2d 1274, 1275 (8th Cir. 1978), the court clearly instructed the jury that appellant was not on trial for any conduct not alleged in the indictment.

We agree that the evidence of similar activities by persons other than appellant was relevant to the issues before the court, not unduly time consuming and possessed probative value which sufficiently outweighed any prejudicial impact. For such reasons, it was properly admitted.

**VI. The Trial Court's "On or About" Instruction as to the Exact Date of the Offenses Charged**

Appellant asserts trial court impropriety in its instruction to the jury that " * * * the proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged."[23]

Appellant in his brief recognizes that the "on or about" instruction is generally approved. *See* e. g., *United States v. Henderson,* 434 F.2d 84, 86 (6th Cir. 1970); *United States v. Brody,* 486 F.2d 291 (8th Cir. 1973).

We are unable to accept appellant's claim that designation of a specific date is essential to proof of the offense against him.

**VII. Insufficient Evidence to Warrant an Acquittal**

Finally, as somewhat of a catchall, appellant alleges that the evidence presented at trial was insufficient to sustain his convictions and, as a result, his motions for judgments of acquittal were improperly denied.

23. T.T. 1214.

█ The function of an appellate court is not to resolve conflicts in testimony, or judge the credibility of witnesses, this is for the jury. As a corollary thereto, it is well established that by reason of the jury's findings of guilty, the government is entitled on appeal to the benefit of all reasonable inferences from the evidence and that any conflicts in the testimony are to be resolved in favor of the jury verdict. *United States v. Knife*, 592 F.2d 472 (8th Cir. 1979); *United States v. Smith*, 564 F.2d 244 (8th Cir.), *cert. denied*, 434 U.S. 1079 (1978).

█ We feel that the jury verdict is adequately sustained by the sufficiency of the evidence. Accordingly, appellant's motions were properly refused.

Affirmed.