**Robert SMALLEY, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 85–2221–WA.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1986.

Decided Aug. 20, 1986.

James R. Wyrsch, Kansas City, Mo., for appellant.

Maury S. Epner, Washington, D.C., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and HARPER,* Senior District Judge.

HARPER, Senior District Judge.

Robert Smalley appeals from a final judgment entered in the District Court[1] for the Western District of Arkansas upon a jury verdict finding him guilty of one count of conspiring to falsify the records of licensed firearms dealers in violation of 18 U.S.C. §§ 922(m) and 371, and one count of knowingly receiving stolen property in violation of 18 U.S.C. § 2315. The district court sentenced Smalley to a one-year prison term on each of the two counts, to be served concurrently, and ordered Smalley to pay a special assessment of fifty dollars in accordance with 18 U.S.C. § 3013.

For reversal, Smalley contends that, (1) he was denied a fair trial because the Government (a) used false and misleading testimony to secure his conviction, (b) withheld exculpatory evidence in violation of *Brady v. Maryland,* and (c) asked questions during cross-examination about Smalley's beliefs and associations which were highly prejudicial; (2) the evidence was insufficient to support the jury's verdict; and (3) the district court erred in sustaining the Government's objection to extrinsic evidence offered by Smalley for the purpose of attacking the credibility of the Government's key witness. For the reasons discussed below, we affirm the judgment of the district court.

* The HONORABLE ROY W. HARPER, Senior U.S. District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable H. Franklin Waters, Chief U.S. District Judge for the Western District of Arkansas.

The grand jury's indictment charged Smalley with one count of conspiring to falsify the records of licensed firearms dealers in violation of 18 U.S.C. §§ 922(m) and 371, and one count of knowingly receiving stolen money in violation of 18 U.S.C. § 2315. Two other persons, Bill Bruegel and Randall Rader, were also named in the indictment as having been involved in the alleged illegal activities. However, neither Bruegel nor Rader was charged in the indictment.

The evidence viewed in the light most favorable to the Government, in accordance with the verdict, is as follows: In June 1984, Randall Rader joined a group of men who called themselves "Brudersweigen," or as it was more commonly known, "the Order." The Order is known to have engaged in bank robbery, armored car robbery, arson, sabotage and counterfeiting. In June or July 1984, members of the Order perpetrated an armored car robbery in Mendocino County, California, which yielded Three Million Six Hundred Thousand Dollars. Rader's involvement with the Order was limited to procuring weapons and equipment and training members of the Order in survivalist techniques.

A short time after joining the Order, Rader was given cash totaling One Hundred Forty-Five Thousand Dollars, to be used for purchasing weapons and equipment. Rader recruited Jackie Norton, a long-time friend, as his assistant. Rader secreted most of the One Hundred Forty-Five Thousand Dollars at Norton's home in West Plains, Missouri. In July 1984, Rader and Norton traveled to Fort Smith, Arkansas, and purchased some pistols and night vision equipment from Robert Smalley. Rader also ordered additional firearms and ammunition which were to be picked up sometime later. Rader did not sign any forms recording the firearms purchases. Because Rader did not have enough money with him to pay for the weapons and equipment costing Seven Thousand Dollars, Smalley returned to West Plains, Missouri with Rader and Norton in order to collect the remainder of the purchase amount. At some undisclosed point in time, Rader informed Smalley that he had become involved with the Order and that the money used to pay for the weapons and equipment came from an armored car robbery.

Rader went to Fort Smith again, on October 19, 1984, in order to pick up some of the weapons he had ordered previously from Smalley, as well as to purchase additional firearms and ammunition. Rader paid Smalley Eleven Thousand Dollars in cash for the weapons he was picking up, and ordered an additional Fifty Thousand Dollars worth of weapons and equipment. The new order included twenty AR–15 assault-type rifles. Smally indicated that Rader would be able to purchase these weapons without any paperwork or record of the sale.

The following day, Rader and Smalley drove to Tulsa, Oklahoma, where they attended a gun show. While at the show, Smalley met Bill Bruegel, a licensed firearms dealer, and asked Bruegel to help him acquire the twenty AR–15 rifles. Bruegel contacted Smalley the following week, and told Smalley that he had been unable to locate the rifles. Smalley then asked Bruegel whether, in the event that Smalley was able to locate a supply of AR–15 rifles, he would be willing to record the purchase of the weapons in his official records, although the weapons would actually be purchased by Rader. Bruegel agreed to carry out Smalley's plan for Twenty Dollars per rifle.

Smalley was subsequently able to obtain fourteen AR–15 rifles, which he took to Rader in Fayetteville, Arkansas. Rader immediately placed the rifles in a nearby storage shed. A few days later, Rader dispatched Norton to deliver Thirty-One Thousand Dollars in cash to Smalley as payment for the fourteen rifles. After delivering the rifles to Rader, Smalley went to Bruegel's gun shop in Berryville, Arkansas, where Bruegel recorded the serial numbers of the AR–15 rifles previously delivered to Rader. Bruegel later paid an employee to sign forms falsely indicating that the employee had purchased the rifles,

in turn, from Bruegel. Smalley's firearms records also falsely reflected the sale of fourteen AR–15 rifles to Bruegel. Based upon the foregoing evidence, the jury returned a verdict against Smalley on both counts of the indictment. This appeal followed.

Smalley first contends that he was denied a fair trial because the Government used false and misleading evidence to secure his conviction. In his brief, Smalley details nine alleged instances of false or misleading testimony. It is well established that no trial is fair if the Government causes or permits false testimony to be presented to the jury. *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bigeleisen,* 625 F.2d 203 (8th Cir.1980). We will review each of Smalley's allegations separately.

On direct examination, the Assistant United States Attorney asked Rader, "Did you have any involvement in a murder?" To which, Rader replied, "No." Smalley contends that Rader's response was patently false because earlier in his testimony Rader admitted being a member of the Order, a group that engaged in selected assassinations. Smalley also contends that the Government's questions were intended to persuade the jury that Rader was not a bad person.

■ We hold that the Government was not attempting to mislead the jury as to Rader's character. The Government explored fully Rader's involvement with the Order, as well as Rader's plea of guilty to the charge of conspiring to violate the federal anti-racketeering laws. Based upon these facts, we cannot conclude that the Government was, in any way, attempting to mislead the jury.

■ Smalley contends that Rader lied when asked, "Was there any agreement with the Government as to what you would be sentenced to?" Rader gave a negative response. Prior to trial, the Government furnished Smalley with a copy of a plea bargaining agreement between it and Randall Rader. That agreement provided, in part:

"11. In return for your client's cooperation, we agree to fully and accurately inform the trial court, the Bureau of Prisons, and the United States Parole Commission of the extent of his cooperation and the results of his cooperation, in order that the Court and those Federal institutions may have sufficient and accurate information to determine the proper sentence for him, the proper place of imprisonment for him, and the proper parole eligibility.

"12. If requested by you and/or your client, we will take the necessary steps to recommend that he serve his sentence of imprisonment in the Federal Witness Security Program and that he has the protection of that program upon his eventual release from prison, if that protection is still needed at that time. We will also take the necessary steps to provide for the protection of any members of his family who may be endangered as a result of his cooperation, to include sponsoring their entry into the Witness Security Program if they so request.

"13. We agree that in return for your client's cooperation, we will move to dismiss all outstanding charges in any District other than the racketeering charge specified in paragraph 1, above, at the time of sentencing. We also agree that no additional charges will be brought against him in any district for offenses which he may have committed on behalf of the enterprise."

(Letter from David E. Wilson, Assistant United States Attorney, to Greg M. Devlin, Rader's attorney, dated March 7, 1985.)

Contrary to Smalley's assertions, these provisions do not contemplate that Rader would receive a particular sentence, or that the Government would recommend that Rader receive a particular sentence. The Government, therefore, accurately revealed the substance of its agreement with Rader. Any confusion concerning that agreement,

if any, was most likely caused by comments made by Smalley's counsel and not by any action taken by the Government. During Rader's cross-examination, Smalley's attorney commented: "You're going into the Federal Witness Protection Program, Mr. Rader, but you're trying to get Mr. Smalley to go into the penitentiary." This statement patently mischaracterizes the Federal Witness Program, because it implies that Rader will be in the program in lieu of serving a prison term. As indicated in paragraph 12 of the agreement, Rader will potentially serve time in prison even if he chooses the option of receiving protection in the Federal Witness Security Program. In any event, if Smalley's counsel's comments did have any effect on the jury's deliberations, such effect would have been favorable to Smalley and, therefore, the outcome of the trial was not affected.

Smalley next points to several alleged inconsistencies in the testimony given by the Government's witnesses and contends that these inconsistencies demonstrate the Government's efforts to cause or permit false testimony to be presented to the jury. We have reviewed, in detail, each of the purported inconsistencies and conclude that none of the testimony is inconsistent or contradictory. Additionally, even if the testimony was inconsistent as to certain events, it is the function of the jury to resolve mere evidentiary conflicts. There was sufficient evidence from which the jury could reasonably have found the facts in accordance with their verdict, and, therefore, we will not overturn the jury's determination.

■ Smalley contends that the Government misled the jury by presenting FBI agent Spurgeon's testimony after the testimony of FBI agent Tucker. Agent Tucker recited details of the armored car robbery in California. Agent Spurgeon testified that the Bureau of Alcohol, Tobbaco and Firearms had been prompted to investigate Smalley's records because the FBI in California had found a firearm sold previously by Smalley. The testimony of the FBI agents was separated by unrelated testimony given by Jackie Norton and Michael Martin. Smalley contends that the order and proximity of the FBI agents' testimony left the jury with the false impression that the AR–15 rifles had some connection with the armored car robbery. We find no merit in this contention. The testimony of the two FBI agents was not so proximate in time as to confuse the jury.

In sum, we find that Smalley's contention that the Government presented false and misleading testimony is without merit. We next turn to Smalley's contention that the Government withheld exculpatory evidence in violation of *Brady v. Maryland.*

The Court in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. Initial interpretations of the *Brady* rule differentiated between three factual situations for the purpose of defining "material" evidence. *See e.g. United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).[2]

2. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court noted that "[t]he rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.

"In the first situation ... the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id,* at 103, 96 S.Ct. at 2397.

In the second situation, illustrated in *Brady,* the defense makes a pretrial request for specific evidence and the prosecution knowingly withholds the evidence. *See Id.* at 104–06, 96 S.Ct. at 2397–99.

In the third situation, the defense either makes no request at all or makes a general request for "all exculpatory material" and the prosecution does not reveal the exculpatory evidence. *See Id.* at 106–14, 96 S.Ct. at 2398–2403.

Recently, however, in *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court stated that the following definition of "material" evidence applies in all situations:

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

—— U.S. at ——, 105 S.Ct. at 3384, 87 L.Ed.2d at 494. The Court also made clear in *Brady* that impeachment evidence falls within the *Brady* rule because such evidence is favorable to the accused. *Id.*, at ———— ——, 105 S.Ct. at 3380-81, 87 L.Ed.2d at 490.

In the present case, prior to trial, Smalley filed two discovery motions pertaining to exculpatory evidence in the Government's possession. Smally specifically requested "... evidence exculpatory of the guilt of the defendant or which is favorable to the defendant with respect to the credibility of government witnesses." The Government responded that it had "no evidence in its possession which is favorable to the defendant on the issues of guilt." Smalley contends that the Government did possess exculpatory evidence. Smalley directs our attention to an alleged prior inconsistent statement made by Randall Rader and a statement made by Jackie Norton which allegedly contradicted Rader's testimony. After carefully considering Smalley's argument, we hold that the Government did not deny Smalley a fair trial by withholding *Brady* material.

On March 18, 1985, Rader gave a statement to FBI Agent James Davis. This statement was memorialized in a FBI 302 report. The FBI report indicates that Rader stated that Smalley did not know where the money was coming from, and that Smalley had inquired of Rader where the money was coming from, to which Rader responded that it was coming from someone out west. At trial, Rader denied ever making this statement to Agent Davis, and explained that Agent Davis misconstrued what he had said.

■ Although we find that that the FBI 302 report was both exculpatory and material, we conclude that the Government did not violate the requirements of *Brady*. As indicated in Smalley's brief, Smalley's counsel obtained a copy of the FBI 302 report prior to trial from a source other than the Government. Considering this fact, we cannot understand how Smalley was prejudiced. The essence of *Brady* is to protect a defendant's right to a fair trial and to insure that justice is done. In the present case, we feel that both of these goals were achieved. The Government's duty under *Brady* does not extend to providing information which is already in the possession of the defendant. *See United States v. Young*, 618 F.2d 1281, 1287 (8th Cir.1980); *United States v. Riley*, 530 F.2d 767, 771 (8th Cir.1976).

■ Smalley also contends that the Government failed to produce material, exculpatory statements made by Jackie Norton prior to trial. In his brief, Smalley hypothesizes that these statements reflected, in substance, the same facts contained in Norton's testimony.[3] Smalley contends that Norton's testimony contradicted Rader's testimony and, therefore, was exculpatory and material within the meaning of *Brady*. Because we conclude that the testimony of Rader and Norton was neither conflicting nor contradictory, we hold that Norton's statements were not material and the Government had no duty to produce them.

We now turn to Smalley's contention that the Government improperly injected preju-

---

**3.** The Government has submitted a copy of the entire FBI 302 report written by Agent James Davis concerning Jackie Norton's statement. We have compared the substance of this report to the transcript of Norton's testimony and conclude that nothing pertinent to Smalley's defense was stated in the report that did not come out in Norton's testimony. We, therefore, will refer to Norton's statement and testimony interchangeably throughout the remainder of our discussion.

dice into the trial by cross-examining Smalley on his socio-political beliefs and associations. Smalley contends that the Government's reference to *Posse Comitatus,* a white supremacist organization, created a danger that the jury convicted him because of his beliefs and not because of their belief in his guilt. The Government maintains that its questions were proper in order to establish Smalley's motive for selling weapons to Rader without the required paperwork and at a price which was lower than that charged other customers. The district court overruled Smalley's objections to this line of questioning and Smalley alleges that the court's ruling was erroneous.

■ The trial court's evidentiary rulings will not be reversed unless shown to be an abuse of discretion. *See United States v. Lewis,* 759 F.2d 1316, 1328 (8th Cir.1985). Smalley contends that the record lacks any evidence that he ever had any contact or association with *Posse Comitatus,* and the Government's reference to that organization was clearly an effort to appeal to the jurors' prejudices. After taking into consideration the circumstances surrounding Smalley's sale of weapons to Rader and the substantial testimony presented concerning Rader's association with various white supremacist organizations, we conclude that the district court did not abuse its discretion in allowing questions pertaining to Smalley's beliefs and associations. Evidence of Smalley's beliefs was probative of his motive for committing the crimes of receiving stolen money and falsifying firearms records, and any danger of unfair prejudice, if any, was incidental. *See Stoner v. Graddick,* 751 F.2d 1535, 1547–48 (11th Cir.1985); *United States v. Pelusio,* 725 F.2d 161, 167 (2d Cir.1983).

Smalley next contends that the evidence was insufficient to support the jury's verdict. "In reviewing the sufficiency of the evidence to support a criminal conviction we view the evidence in light most favorable to the government, resolve evidentiary conflicts in favor of the government, and accept as established all reasonable infer-ences that may logically be drawn from the evidence." *United States v. Newton,* 756 F.2d 53, 54 (8th Cir.1985). "The conviction will be reversed only if the reviewing court determines that a reasonable jury could not have found beyond a reasonable doubt that the elements of the crime existed." *Potter v. United States,* 691 F.2d 1275, 1281 (8th Cir.1982). "It is the function of the jury, not an appellate court, to resolve conflict in the testimony or judge the credibility of witnesses." *United States v. Harrison,* 671 F.2d 1159, 1162 (8th Cir.1982). Keeping these principles in mind, we conclude that the evidence was sufficient to support the jury's verdict.

■ Smalley's sole argument regarding this issue is that the testimony given by the Government's witnesses was inconsistent. Initially we note that most of the testimony Smalley points to was not contradictory and, furthermore, where it was conflicting, the testimony concerned only peripheral matters. As stated earlier, it is the function of the jury, not an appellate court, to resolve mere evidentiary conflicts. In the present case, there was sufficient evidence presented from which the jury reasonably could have found beyond a reasonable doubt that the elements of the crimes existed.

The final issue on appeal concerns the district court's refusal to allow Smalley to present the testimony of Joe McCutchen, a licensed pharmacist, to show the effects of a drug called Tranxene on Randall Rader's testimony. On cross-examination, Rader admitted that he was taking Tranxene at the time of his testimony and Smalley sought to impeach Rader's credibility through McCutchen's testimony. The district Court permitted Smalley to make an offer of proof outside the presence of the jury concerning McCutchen's proposed testimony. On offer of proof, McCutchen stated: "Tranxene is a mid-range tranquilizer-antidepressant. ... [I]t induces euphoria in varying degrees, and it has been my experience that when euphoria is induced, one of the things it can do is to break down inhibitions." McCutchen also

agreed that a person under the influence of Tranxene would appear different. The district court sustained the Government's objection to McCutchen's proposed testimony on relevancy grounds. The court noted that "if Tranxene causes ... people to lie [or] if it causes people not to know what they're doing ... then it may be relevant."

"The trial court's [determination whether evidence is relevant] is subject to reversal only for an abuse of discretion." *United States v. Lewis*, 759 F.2d 1316, 1328 (8th Cir.1985). This standard applies equally where expert testimony is involved. *See United States v. Tovar*, 687 F.2d 1210, 1215–16 (8th Cir.1982). As a general rule, evidence concerning a witness' defective sensory or mental capacity, as a result of drug or alcohol use, are admissible for impeachment purposes if it is shown that the witness was under the influence at the time of the occurrence about which he is testifying or is under the influence at the time he testifies. *See* McCormick, Evidence § 45 (Cleary Ed.1984).

In the present case, the district court refused to allow extrinsic evidence on the effects of Tranxene, even though Rader admitted taking the drug prior to testifying. We hold that it was not an abuse of discretion to refuse to allow McCutchen's proposed testimony. On offer of proof, McCutchen stated that he could not answer whether or not "a person [would] have any inhibitions against lying if he was under the influence of Tranxene." McCutchen's testimony, therefore, was not relevant for the purpose of impeaching Rader's credibility. The mere fact that Tranxene may reduce unspecified inhibitions and make a person appear different does not go to Rader's credibility. The district court was correct in refusing to let the jury hear this irrelevant evidence. Additionally, although Rader admitted taking Tranxene, there was no evidence as to the quantity of Tranxene Rader had taken. Without this critical evidence, McCutchen's testimony was merely speculative, and certainly not relevant for the purpose of challenging Rader's credibility.

Accordingly, we affirm the judgment of the district court.