UNITED STATES of America, Appellee,

v.

Isaac N. BURCHINAL, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Russell Jack KERN, Appellant.

UNITED STATES of America, Appellee,

v.

John GERARD, Appellant.

Nos. 80–2025, 80–2026 and 80–2032.

United States Court of Appeals,
Eighth Circuit.

Submitted May 20, 1981.

Decided Aug. 12, 1981.

Rehearing and Rehearing En Banc Denied Sept. 9, 1981.

Donald L. Wolff, Leonard J. Frankel (argued), Wolff & Frankel, Clayton, Mo., for appellant Kern.

Robert D. Kingsland, U. S. Atty., Kevin F. O'Malley (argued), David M. Rosen, Pamela H. Bucy, Asst. U. S. Attys., E. D. Mo., for appellee United States of America.

Russell Jack Kern, pro se.

John Gerard, pro se.

Allen I. Harris, St. Louis, Mo., for appellant Gerard.

Frederick H. Mayer, Ronald E. Jenkins (argued), St. Louis, Mo., for appellant Burchinal; Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., James P. Finstrom, Dallas, Tex. (rebuttal), of counsel.

Before LAY, Chief Judge, and ROSS and ARNOLD, Circuit Judges.

ROSS, Circuit Judge.

Isaac Newton Burchinal, Jr., Russell Jack Kern and John Gerard were indicted on August 6, 1980, along with 11 other individuals. Count I of the indictment charged all 14 defendants with conspiring "to distribute, and possess with intent to distribute, marijuana, methaqualone and hashish," in violation of 21 U.S.C. §§ 841(a)(1) and 846. Each of the three appellants also faced charges of interstate travel in furtherance of their unlawful activities in violation of 18 U.S.C. § 1952(a)(3) and (2) of the Travel Act.

Burchinal, Kern and Gerard were tried before a jury in the United States District Court for the Eastern District of Missouri,[1] along with Joseph S. (PaPa Jo) Olivastro. Although Olivastro was acquitted, Burchinal was convicted of conspiracy (the government dismissed Count VI, charging Burchinal with a Travel Act violation) and Kern and Gerard were found guilty of both the conspiracy and Travel Act charges. Burchinal was fined $15,000 and sentenced to five years imprisonment and both Kern and Gerard were fined $25,000 and sentenced to 10 years imprisonment. We affirm the convictions on all counts, but remand to the district court for the purpose of reducing the costs assessed against Kern.

The history of this conspiracy is rather complicated but may be summarized from the evidence at trial as follows: In the fall of 1978, Anthony Clay (T.O.) Olivastro, a St. Louis drug dealer, came in contact with Oscar Ansourian, who was to serve as a new source of drugs. Ansourian was interested in obtaining an airplane to transport marijuana and methaqualone from a landing strip in Colombia, South America, to the United States. Joseph M. (JoJo) Olivastro thereafter contacted a pilot, Robert H. Boumis (the prosecution's chief witness in the trial of the three appellants), who agreed to obtain and fly the aircraft that was needed for the smuggling venture.

In late March of 1979, after alternate plans had failed, JoJo Olivastro directed Boumis to investigate the possibility of buy-

---

1. The Honorable James H. Meredith, District Judge, presiding.

ing a plane from a man who had been recommended by Billy Muniz, a pilot from Arizona. Boumis and JoJo Olivastro then flew to Tucson, and eventually were taken to the municipal airport in Eloy, Arizona. Muniz then introduced Boumis and JoJo Olivastro to Isaac Newton (Junior) Burchinal, Jr.

Burchinal agreed to provide a C54 transport and to modify it to meet Boumis' requirements. In addition, Burchinal agreed to train Boumis to fly the plane under conditions similar to those anticipated at the clandestine landing strip in Colombia, and eventually accepted approximately $167,000, in advance, for his efforts. When Burchinal's progress on the deal proved unsatisfactory, the members of the conspiracy decided to go forward with an offer from appellant John Gerard, whom Boumis had met in the course of his dealings with Burchinal in Eloy. The money "fronted" to Burchinal was ultimately regained by the group, less several thousand dollars for Burchinal's expenses in completing the few improvements which had been made up to that point in time.

Immediately after the group terminated its arrangements with Burchinal, several members met with Gerard in a restaurant near Eloy. Gerard repeated the substance of his earlier proposals to Boumis, wherein he had indicated that he knew an individual who would supply a C54 which was in better condition than Burchinal's and for less money, and that an experienced and qualified crew could also be provided. Gerard additionally offered to fly the plane with Boumis in the event that a qualified crew could not be found.

Later that same day, Boumis inspected the plane and was then introduced to appellant Russell Jack Kern. Boumis explained the difficulties that the group had had with Burchinal and said that they were in no position to go through a similar experience with Kern and Gerard. He therefore explained to both of them that he needed the plane to fly to Colombia and bring back a load of marijuana, and that if the plane could not be prepared and if a qualified

crew with previous smuggling experience could not be provided, there would be no point in entering into the venture. Kern indicated that he could definitely provide the plane and the crew. Gerard had earlier stated that the plane, with modifications, would cost $145,000.

On the following day, T. O. Olivastro and Boumis met with Gerard and Kern at Kern's place of business at the Tucson International Airport. Olivastro got a commitment from Gerard that the plane would be ready, and an agreement was reached. Boumis later received phone calls from pilots who had been referred to him by Kern, and a crew was assembled. In addition, Kern falsified the plane's registration, along with other FAA documents, and agreed that the plane could be returned to the Tucson International Airport after the trip, for a fee. Kern also indicated that he would explain the plane's absence if anyone should inquire, and told Boumis that if he wanted to bring the plane back after a second smuggling trip, he would have to relinquish all interest in the plane without compensation.

On June 16, 1979, after a few minor setbacks, the crew attempted its flight to Colombia. Shortly after the plane took off one of the engines broke down and the plane made an emergency landing back at the airport in Tucson. Although Kern was disappointed that an emergency had been declared, he told the crew to leave, and he said that he would handle the problems with the authorities.

In the middle of August, a meeting was arranged in Peoria, Illinois. T. O. Olivastro informed Boumis that the meeting was called to discuss the least expensive solution to their problem of finding an aircraft to complete the smuggling venture. Several members of the conspiracy met, including T. O. Olivastro, Boumis, Kern and Gerard. Most of the meeting was devoted to the topic of what Kern intended to do to compensate the rest of the group for the damaged C54. Although Kern felt little responsibility for the plane, an agreement was finally reached whereby the group would

receive the title to an airplane which Kern and Gerard had flown to Peoria. The group took possession of the plane in October of 1979.

Prior to the trial, nine of the defendants entered guilty pleas and only the three appellants and Joseph S. Olivastro went to trial. One defendant, Oscar Ansourian, was not in custody at the time of the trial.

## ISAAC NEWTON BURCHINAL, JR.

On appeal, Burchinal raises several issues for our consideration: (1) whether the evidence was sufficient to support his conviction for conspiracy; (2) whether the trial court erred in admitting evidence of a prior bad act; (3) whether the trial court erred in limiting the scope of cross-examination of Boumis; (4) whether the evidence established the existence of multiple conspiracies rather than the single one charged in the indictment; (5) whether the trial court erred in denying Burchinal's motion for severance; and (6) whether the trial court erred in denying the appellant's access to alleged *Brady* material.

### (1) The Sufficiency of the Evidence

Burchinal first argues that the evidence was insufficient to support his conviction, as a matter of law, because the government merely established that he had agreed to supply a lawful item to the conspiracy which was never actually supplied, and that there therefore was no evidence of "deliberate, knowing and specific intent to join the conspiracy." *United States v. Chandler,* 586 F.2d 593, 599 (5th Cir. 1978), *cert. de-*

nied, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979). We disagree for two reasons.

First, the law in this Circuit is quite clear that an individual becomes a member of a conspiracy when the person knowingly contributes his or her efforts in furtherance of the objectives of the conspiracy:

[A] coconspirator may even become a member of the conspiracy without being in on it at its inception. One need only knowingly contribute his efforts in furtherance of it. * * * he still would adopt the previous acts and declarations of his fellow conspirators. *Phelps v. United States,* 8 Cir., 160 F.2d 858; *Hernandez v. United States,* 9 Cir., 300 F.2d 114, *United States v. Dardi,* 2 Cir., 330 F.2d 316. We said in *Phelps* :

" * * * And, of course, a defendant can join a conspiracy at any time and may be found to have done so when, *with knowledge of its existence,* he has undertaken to further its design." 160 F.2d at 868.

*Nassif v. United States,* 370 F.2d 147, 152 (8th Cir. 1966) (emphasis supplied). *See United States v. Jones,* 545 F.2d 1112, 1115 (8th Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977); *United States v. Hester,* 465 F.2d 1125, 1127 (8th Cir. 1972). And if these elements are established by the evidence, we see little relevance to Burchinal's suggestions that this case must be viewed in a different light because he had agreed to sell the conspiracy an otherwise lawful item[2] or because that

---

**2.** The cases cited by Burchinal for this proposition are not inconsistent with our holding in this case. In *United States v. Falcone,* 311 U.S. 205, 208, 61 S.Ct. 204, 205, 85 L.Ed. 128 (1940), the Supreme Court held that a wholesale grocer who sold sugar to distillers with the knowledge that it was to be used for illegal distilling could not, on that evidence alone, be convicted of conspiring with the distillers. In *Direct Sales Co. v. United States,* 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674 (1943), however, the Supreme Court cautioned that the *Falcone* decision cannot be read so narrowly as to support the view that one who sells a lawful good to another with knowledge that the good will be used for illegal purposes can *never* be

found guilty of conspiring with the user of the good:

The *Falcone* case creates no such sweeping insulation for sellers to known illicit users. That decision comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, *unless he knows of the conspiracy*; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally.

(Emphasis supplied.) In the present case, we feel that the evidence sufficiently supports the inference that Burchinal knew of the conspiracy.

item was never, in fact, supplied to the group.[3]

Second, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). And we take as established all reasonable inferences which tend to support the action of the jury. *United States v. Fuel*, 583 F.2d 978, 980 (8th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). We have carefully studied the transcript and the remainder of the evidence, and we conclude that the evidence in the record supports the jury's conclusion that Burchinal knowingly became a member of the conspiracy. That evidence is summarized in the following paragraphs.

When Boumis was first driven to the airport in Eloy, Bill Muniz told him that no vehicles which were registered in the name of their true owners could be taken to the airport; the group consequently switched cars to avoid detection by the authorities. Once Boumis was introduced to Burchinal, it was explained that he wanted a plane which could be operated from an "unimproved strip, an unimproved surface, at approximately sea level elevation, high temperatures, [and] relatively low wind." In addition, the range and weight capacity of the aircraft were discussed, and it was agreed that the plane would be modified for "long over-the-water navigation." It was also agreed that Burchinal would train Boumis to fly under such conditions.

Aside from Burchinal's willingness to prepare the plane and pilot for conditions which are consistent with drug smuggling operations, there are specific conversations from which the jury could infer that Burchinal was aware of the purpose of the conspiracy. For example, Boumis also asked Burchinal if he knew of any place in the United States where he could land for fuel if he was "going to leave the country southbound without having any problems with anyone." Burchinal knew where there was such a place, but when he was asked whether the group could return the aircraft to his airport in Eloy he promptly declined. He did say, however, that he knew of another place where the plane could be taken.

On Boumis' second visit to Eloy, Burchinal suggested that Boumis should compensate Billy Muniz for his part in the operation. Boumis testified as to the following conversation:

> Junior said to me, he said, "You know, you ought to do something for this boy here," pointing to Billy, who was sitting to his immediate left down low, he said, "because nobody's taking care of him." Billy explained to me that he was without funds and he was going to be my fellow pilot on the trip. So I said, "Billy, while I'm gone would you please oversee things and make sure everything gets done," and I said, "I'd appreciate it," and I said, "I'll stay in touch with you."
>
> I then gave him $2,500 cash.

During Boumis' next trip to Arizona on May 3, 1979, he went on a short training flight with Burchinal. After the flight, Burchinal told Boumis about a magazine

---

3. Although we are aware that neither mere association with members of a conspiracy nor mere knowledge, approval or acquiescence in the object of a conspiracy is sufficient as proof that an individual is part of that conspiracy, *United States v. Moss*, 591 F.2d 428, 435 (8th Cir. 1979); *United States v. Brown*, 584 F.2d 252, 262 (8th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979), there is no issue in the present case as to whether Burchinal contributed to the furtherance of the conspiracy. It is undisputed that Burchinal installed the auxiliary fuel tanks and the electronic navigational communications aids on the first C54 before the other members of the con-

spiracy decided to pursue Gerard's offer of a second C54, and Burchinal also kept a portion of the purchase price for his expenses. In addition, Boumis testified that Burchinal was disappointed with the group's decision to withdraw and that he was still willing to keep his commitment and get the plane ready. Accordingly, the only real issue for the jury to decide on the basis of the reasonable inferences and circumstantial evidence was whether Burchinal had the "requisite knowledge" when he committed these acts in furtherance of the conspiracy. *See United States v. Chandler*, 586 F.2d 583, 599 (5th Cir. 1978).

article in which he had been quoted as saying that "[h]e taught marijuana smugglers how to fly so that they would not kill theirselves." Two days later, after Boumis was flown to Burchinal's airport in Paris, Texas, Burchinal joked about two individuals who were buying a plane from him for $68,000 to haul marijuana because the plane in question would not hold a suitable quantity of marijuana. Later that same day, Boumis asked Burchinal how much marijuana another aircraft would hold and, after Burchinal answered, Boumis told him that he knew of another group which might be interested in buying the plane to haul marijuana from Jamaica if he ever got "finished with the Colombian thing."

When the group finally expressed their dissatisfaction to Burchinal, Boumis informed him that the group's merchandise had been "popped" in Colombia because of the delays caused by Burchinal. Even after receiving that information, Burchinal still was willing to keep his commitment to supply the plane. Finally, the prosecution read a stipulation which informed the jury that on a previous occasion, more than a year before the events involved in this conspiracy, Burchinal had been approached by an undercover agent of the Drug Enforcement Agency (DEA) and had been asked if he would sell an airplane to the agent so that the agent could smuggle marijuana from Colombia to the United States. Burchinal agreed to the deal but the agent never followed through.

■■■ Although there is no direct evidence that Burchinal knowingly contributed his efforts in furtherance of the conspiracy, the law is clear that circumstantial evidence will suffice as proof of an individual's involvement in a conspiracy. *United States v. Brown*, 584 F.2d 252, 262 (8th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979); *United States v. Col-*

lins, 552 F.2d 243, 245 (8th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977). Moreover, it is the general rule that the evidence need not exclude every reasonable hypothesis other than that of guilt; rather, it is only necessary that the evidence be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty of the crime with which he or she has been charged. *Id.* In light of the foregoing, we hold that the evidence is sufficient to support the jury's conclusion that Burchinal is guilty of conspiracy as alleged in Count I of the indictment.[4]

*(2) Evidence of Prior Bad Acts*

Burchinal next argues that the trial court erred in permitting the prosecution to read into evidence the following stipulation which was signed by all trial counsel, but which was read at the conclusion of the government's case-in-chief over the objection of Burchinal's counsel:

### STIPULATION

"On or about June the 29th, 1978, Special Agent Eaton met Junior Burchinal while acting in an undercover capacity in Eloy, Arizona. During a conversation between Junior Burchinal and Special Agent Eaton, Junior Burchinal agreed to sell a Convair 240 (T29A) with modifications after Eaton told him that the plane was to be used solely to smuggle marijuana from Colombia to the United States.

"Special Agent Eaton never returned with the money. The sale was never consummated and the plane was never delivered. Mr. Burchinal was not arrested, indicted or convicted for what transpired during the meeting of June the 29th, 1978.

"This conversation took place before the conspiracy alleged in Count I of the indictment."

**4.** Although the indictment alleged that the defendants conspired to possess and distribute marijuana, methaqualone and hashish, the evidence established that the purpose of the conspiracy was to smuggle marijuana, and only passing reference was made to methaqualone. We nevertheless find that this variance is not fatal. The general rule is that an indictment which alleges a conspiracy to commit several offenses is sustained by proof of a conspiracy to commit any one of the offenses. *United States v. Wedelstedt*, 589 F.2d 339, 342 (8th Cir. 1978), *cert. denied*, 442 U.S. 916, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

The stipulation was also viewed by the jury prior to final arguments and was alluded to in the government's rebuttal argument. Burchinal's objections and his motion for a mistrial were denied.

■ Burchinal argues that this evidence of a prior act is inadmissible under the general rule that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Fed.R.Evid. 404(b). However, Rule 404(b) permits such evidence to be admitted for the purpose of proving "motive, opportunity, *intent*, preparation, plan, *knowledge*, identity or absence of mistake or accident." The standards in this Circuit for the admission of other crimes evidence for such purposes are by now quite familiar:

> Our cases reveal certain requirements which must be met for other crimes evidence to be admissible under the rule: (1) a material issue on which other crimes evidence may be admissible has been raised, *e.g., United States v. Drury*, 582 F.2d 1181, 1184 (8th Cir. 1978); *United States v. Maestas*, 554 F.2d 834, 837 (8th Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977); (2) the proffered evidence is relevant to that issue, *ibid.*; (3) the evidence of the other crimes is clear and convincing, *e.g., United States v. Cobb*, 588 F.2d 607, 612 (8th Cir. 1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *United States v. Drury, supra*, 582 F.2d at 1184; *United States v. Davis*, 551 F.2d 233, 234 (8th Cir.), *cert. denied*, 431 U.S. 923, 97 S.Ct. 2197, 53 L.Ed.2d 237 (1977). In addition, to be admissible on such issues as intent, knowledge, or plan, the other crimes evidence must relate to wrongdoing "similar in kind and reasonably close in time to the charge at trial." *United States v. Drury, supra*, 582 F.2d at 1184. *See, e.g., United States v. Little*, 562 F.2d 578, 581 (8th Cir. 1977); *United States v. Jardan*, 552 F.2d 216, 219 (8th Cir.), *cert. denied*, 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977). Finally, evidence otherwise admissible under Rule 404(b) may be excluded under Fed.R.Evid. 403,

"if its probative value is substantially outweighed by the danger of unfair prejudice * * *."

*United States v. Frederickson*, 601 F.2d 1358, 1365 (8th Cir.), *cert. denied*, 444 U.S. 934, 100 S.Ct. 281, 62 L.Ed.2d 193 (1979).

■ In ruling on the admissibility of evidence of other crimes or acts, the trial court has wide discretion. On appeal, "[o]ur task is to assess the relevancy and the probative value of the challenged evidence; if it meets the requirements of Rule 404(b) we may not reverse the ruling of the District Court unless we also find that the prejudice from admitting the evidence substantially outweighed it's probative value." *United States v. Maestas*, 554 F.2d 834, 836 (8th Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977).

■ In this case, the government bore the burden of proving that Burchinal knowingly and intentionally furthered the aims of the conspiracy. Where intent or guilty knowledge are elements of the crime charged, evidence of other crimes or acts tending to establish those elements is generally admissible. *United States v. Young*, 618 F.2d 1281, 1289 (8th Cir.), *cert. denied*, 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980); *United States v. Gocke*, 507 F.2d 820, 824 (8th Cir. 1974), *cert. denied*, 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975). Furthermore, "[t]he government need not await the defendant's denial of intent before offering evidence of similar acts relevant to that issue." *United States v. Adcock*, 558 F.2d 397, 402 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Finally, we note that the jury was properly instructed that the appellant was not on trial for any conduct which was not alleged in the indictment. *United States v. Young, supra*, 618 F.2d at 1289; *United States v. King*, 572 F.2d 1274, 1275 (8th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978).

■ Turning to the substance of the stipulation, we conclude that it provided clear and convincing evidence of similar wrongdoing on the part of Burchinal which

was relevant to the issue of his knowledge and which was close in time to the events for which he was indicted. We also find that the probative value of the stipulation outweighs any unfairly prejudicial effect. Accordingly, we find no abuse of discretion in the trial court's admission of the challenged evidence in this case.

### (3) Cross-Examination of Boumis

■ During the trial, Joseph Olivastro's counsel sought to cross-examine the government's main witness, Robert Boumis, about his drug dealings after the conspiracy had ended: "Now, then, since January of 1980 have you participated in a transaction to buy and/or sell marijuana with Michael Mannes?" The government objected to the question on the basis of Fed.R.Evid. 608(b), which excludes the introduction of extrinsic evidence of criminal activity for the purpose of attacking a witness' credibility where no conviction resulted from that activity:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, * * *

■ Olivastro's offer of proof indicated that the purpose of the question was to show that Boumis and another prospective government witness were continuing to deal drugs in March, April and May of 1980, after having been given immunity for prior offenses and after having been placed under the Witness Protection Act. The question is arguably probative of Boumis' truthfulness because Boumis had earlier testified that he last sold marijuana in December of 1979 or January of 1980. However, even if Boumis had been questioned about and denied subsequent drug dealings the defense could not under Rule 608(b) offer any "extrinsic evidence" of such dealings. Even if

the question was technically allowable under Rule 608(b), it is clear that no prejudicial error can be shown.

Boumis was on the witness stand for two and one-half days. During that time he frequently admitted his involvement in a host of illegal and dishonest activities. In light of this testimony it is difficult to perceive how the absence of an answer to this one question prejudiced Burchinal's effort to discredit Boumis to the point of creating reversible error. *See United States v. Hastings,* 577 F.2d 38, 42 (8th Cir. 1977). In addition, the trial court is given broad discretion in permitting impeachment of a witness by cross-examination under Rule 608(b), *United States v. Young,* 567 F.2d 799, 803 (8th Cir. 1977), *cert. denied,* 434 U.S. 1079, 98 S.Ct. 1273, 55 L.Ed.2d 786 (1978).

### (4) Single or Multiple Conspiracies

■ Burchinal next argues that the proof at trial is fatally at variance with the conspiracy charged in Count I of the indictment. In his view, the evidence established no more than a series of "rip-offs" in which the major operants in the alleged conspiracy constantly devised new methods of stealing money from the financial backers of the scheme. We disagree. We have carefully reviewed the evidence in this case and conclude that "the totality of the circumstances indicates a single overall conspiracy." *United States v. Tercero,* 580 F.2d 312, 317 (8th Cir. 1978).

### (5) Severance.

■ The guidelines governing our review of a district court's denial of a motion to sever are as follows:

> A motion for severance under Fed.R. Crim.P. 14 is addressed to the sound discretion of the trial court. *United States v. Anthony,* 565 F.2d 533, 538 (8th Cir. 1977); *United States v. Jackson,* 549 F.2d 517, 523 (8th Cir.), *cert. denied,* 430 U.S. 985 [97 S.Ct. 1682, 52 L.Ed.2d 379] (1977); *Williams v. United States,* 416 F.2d 1064, 1070 (8th Cir. 1969). The general rule is that persons charged in a conspiracy

should be tried together, especially when proof of the charges is based upon the same evidence and acts. *United States v. Jackson, supra* at 523; *United States v. Kirk,* 534 F.2d 1262, 1269 (8th Cir. 1976); *United States v. Hutchinson,* 488 F.2d 484, 492 (8th Cir. 1973), *cert. denied,* 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974). Severance will only be granted upon a showing of real prejudice to an individual defendant, *Id.,* and requires more than merely showing a better chance of acquittal at a separate trial. *United States v. Anthony, supra* at 538; *United States v. Wofford,* 562 F.2d 582, 586 (8th Cir. 1977). Thus, a denial of severance is not a ground for reversal unless clear prejudice and an abuse of discretion is shown. *United States v. Jackson, supra* at 523.

*United States v. Smith,* 578 F.2d 1227, 1236 (8th Cir. 1978). We have examined Burchinal's allegations of prejudice and find them to be without merit. Burchinal has failed to show either clear prejudice or an abuse of the trial court's discretion.

### (6) Brady Material

 Shortly before the trial of the appellants the government became aware that the Internal Revenue Service had interviewed Boumis in 1978 in the course of an investigation of one of Boumis' business partners. During the interview, Boumis lied to the agents about his investments in a St. Louis massage parlor and the income he derived from the business. The government disclosed this information to the defendants and the defendants moved for total access to the interview under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The information came from the Internal Revenue Service's file on the business partner and there was some question as to whether or not the contents of the interview could be disclosed. Judge Meredith thus reviewed the transcript and ruled that the information concerning Boumis' two lies was "the only portion of the complete state-

ment which is relevant for the purpose of testing the credibility of Robert Boumis." Accordingly, the defendants' motions were denied and the transcript was sealed.

 We have reviewed the transcript of the interview and we have determined that there was no other information which would have been relevant for the purposes of cross-examination. Moreover, we note that the two lies were brought up on direct examination of Boumis and again, several times, on cross-examination. The government is required to turn over all evidence which is favorable to the defense under the *Brady* case, but only if that information is "both material and likely to affect the outcome of the trial." *United States v. Young, supra,* 618 F.2d at 1287. The information sought by the appellants in this case does not meet these criteria.

### RUSSELL JACK KERN

Kern also raises several issues on appeal: (1) whether the evidence is sufficient to support his conviction; (2) whether the trial court erred in denying his motion for a mistrial due to publicity during the trial; and (3) whether the trial court erred in ordering Kern to pay the cost of producing 29 records custodian witnesses. In a *pro se* brief, Kern argues that the evidence is insufficient to support his conviction for violating the Travel Act and that the proof established multiple conspiracies rather than the single one alleged in the indictment.[5]

### (1) Sufficiency of the Evidence

 Kern's challenge to sufficiency of the evidence in support of his conviction for conspiracy amounts to little more than an attack on the credibility of the government's prime witness, Robert Boumis. It is argued that there would have been no conviction without the testimony of Boumis, and that in granting Boumis immunity and in paying him support money the government marshalled its "infinite financial re-

---

5. Kern also adopts Burchinal's arguments as to the scope of cross-examination of Boumis and the *Brady* material. We find these arguments unpersuasive for the reasons cited above.

sources to buy a conviction it could not otherwise prove up." The information concerning Boumis' immunity was before the jury, however, along with the evidence of his numerous illegal and dishonest activities. The jury nevertheless chose to believe his testimony and we are mindful that such questions relating to the credibility of witnesses and the weight to be accorded their testimony are properly left to the jury rather than to the reviewing court. In addition, we must view the evidence in the light most favorable to the government and we must give to the government the benefit of all reasonable inferences which may be drawn from that evidence. *United States v. Sullivan*, 618 F.2d 1290, 1295 (8th Cir. 1980); *United States v. Young, supra*, 618 F.2d at 1290. Accordingly, we hold that the evidence was sufficient to support Kern's conviction for conspiracy.

We also find that the evidence was sufficient to support Kern's conviction under the Travel Act. Kern argues that the conviction must be overturned because there was no evidence of organized crime or racketeering. However, we find no such requirement under the terms of 18 U.S.C. § 1952, which reads, in part, as follows:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

In our view, the evidence amply demonstrated that Kern and Gerard traveled to Peoria to "promote, manage, establish, [and] carry on" the unlawful activity of conspiring to import narcotics.

*(2) Prejudicial Publicity*

On the morning of the third day of the trial, the St. Louis Globe-Democrat carried a news story concerning the trial and the background of the conspiracy. Before any evidence was received that morning, the jury was polled by Judge Meredith and it was determined that three of the jurors had read the article. The rest of the jury was excused and the three were questioned, separately, by the court and counsel. The trial court asked only a few questions but counsel for Mr. Olivastro asked specific questions about the content of the article, the jurors' recollection of the details and their ability to remain impartial. Although two of the three jurors recalled from the article that several of the other defendants had admitted their guilt, each affirmed that he could maintain his impartiality and base the verdict solely on the evidence at trial. None of the other counsel objected to the procedure followed and none requested any different method of questioning. Kern, Gerard and Olivastro nevertheless moved for a mistrial.

 Kern argues that his conviction should be reversed because Judge Meredith failed to personally investigate the jurors' possible prejudice and because he denied Kern's motion for a mistrial. We disagree. The trial court has great discretion in ruling on the issue of prejudice resulting from news articles concerning an ongoing trial. And each case must turn on its own special facts. *United States v. Williams*, 604 F.2d 1102, 1114 (8th Cir. 1979). We find no abuse of that discretion in the present case.

The district court's procedure in this case is in accordance with that suggestion in

*United States v. Hood*, 593 F.2d 293, 296 (8th Cir. 1979):

> Whenever it appears during the course of a trial that the members of the jury may have been exposed to publicity which is adverse to the defendant, the trial judge must make an initial determination as to whether the publicity creates a danger of substantial prejudice to the accused. * * * If the trial judge determines that it does, the jurors should then be polled individually to determine whether they have in fact been exposed to the prejudicial information. If any jurors have been so exposed, the trial judge must ascertain the extent and effect of the infection, and what measures, including the possible declaration of a mistrial, must be taken to protect the rights of the accused.

(Citations omitted.) In addition, a review of the transcript indicates that the possibility of juror bias was fully investigated by counsel in their voir dire of the jurors. Although this procedure might not produce satisfactory results in every situation, we are convinced, given the facts of this case, that the procedure was adequate. Moreover, the parties moving for a mistrial at no time objected to the method of questioning or suggested any alternatives. "Under such circumstances, appellant cannot be heard to complain of the manner or scope of the inquiry conducted by the District Court." *United States v. Word*, 519 F.2d 612, 615 (8th Cir. 1975), *cert. denied*, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1976).

Finally, we find no error in the trial court's denial of Kern's motion for mistrial. We have read both the transcript and the newspaper article in question and we find no evidence of prejudice. Even if the article met the threshold requirement of creating "a danger of substantial prejudice to the accused," *United States v. Hood, supra,* 593 F.2d at 296, however, we have already pointed out that the procedure followed by the district court properly determined that there was no threat to the rights of the defendants.

### (3) Costs

 Kern next argues that the district court abused its discretion in assessing the costs of producing records custodian witnesses ($11,999.80) against him. He does not deny that the district court generally has the discretionary authority to tax the costs of prosecution against the defendant under 28 U.S.C. § 1918(b):

> Whenever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution.

However, Kern received the maximum fine and sentence under both Count I and Count XI[6] and it is his contention that a court may not assess costs of prosecution in addition to the maximum fine permitted by that statute unless the statute specifically provides for such an assessment. Again, we disagree.

Kern cites the case of *United States v. Ducharme*, 505 F.2d 691, 692 (9th Cir. 1974) (per curiam), as authority for his argument.[7] In *Ducharme*, the defendant was convicted of supplying false information on his Employees Withholding Exemption Certificates in violation of 26 U.S.C. § 7205. He was put on probation and was ordered to pay the maximum fine and costs of prosecution. On appeal, the Ninth Circuit Court of Appeals held that

> Section 7205 does not authorize the assessment of costs in addition to a fine as do other sections of Title 26, e. g., 7201, 7202 and 7203. The maximum fine authorized for a violation of § 7205 is $500

---

**6.** Kern received a fine of $15,000 and a sentence of 5 years for his conviction under 21 U.S.C. § 841(b)(1)(B) and 846, and a fine of $10,000 and a sentence of five years under 18 U.S.C. § 1952 (Travel Act).

**7.** The other authorities cited by Kern are inapposite. In *United States v. Taxe*, 540 F.2d 961, 970 (9th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977), for example, the court pointed out that the "*Ducharme* question" was not even reached by the court on appeal. Similarly, we have found little or no acceptance of the *Ducharme* decision in the Ninth Circuit or in others.

and the assessment of costs of prosecution is tantamount to increasing that fine. *Id.* at 692. The award of costs in addition to the maximum fine under the statute was thus stricken from the sentence.

We do not feel that the *Ducharme* decision is controlling in this case. The language of 28 U.S.C. § 1918 is very general, and in our opinion it applies to all criminal prosecutions other than capital cases. If Congress had intended that the costs of prosecution could be assessed under § 1918 only where the statute under which the defendant is convicted specifically provides for such an assessment, § 1918 would be redundant and meaningless. We cannot accord such an interpretation to the statute.

■ In addition, we point out that Kern is the only one of the four defendants at trial who would not stipulate to the authenticity or the foundation of the exhibits. And once the 29 custodial witnesses were called to establish the authenticity of the documents in question, Kern did not cross-examine any of them or object to the admission of any of the records. Accordingly, we cannot agree that the assessment of costs amounted to an excessive fine in this case or that the district court abused its discretion in assessing the costs.

Finally, we note that the government concedes that the travel costs of one witness ($220) who did not testify was inadvertently and improperly added to Kern's assessment. Thus, the total costs of assessment should be amended to total $11,779.80.

We have examined the other issues raised in Kern's briefs and find them to be without merit. In particular, we find no merit to Kern's argument that the evidence established that several conspiracies existed rather than the single conspiracy alleged in the indictment. Accordingly, Kern's conviction and his sentence, as modified, are affirmed.

### JOHN GERARD

The issues raised by Gerard are as follows: (1) whether the trial court erred in admitting evidence of a prior bad act; (2) whether the trial court erred in denying Gerard's motion for a mistrial due to publicity during the trial; (3) whether the trial court erred in denying Gerard's motion for severance; and (4) whether the trial court erred in failing to direct a verdict on Count XI (Travel Act). In his *pro se* brief, Gerard also alleges that the evidence is insufficient to support his conviction under Count XI and that the evidence established the existence of several conspiracies rather than the one alleged in the indictment.[8]

### (1) Evidence of Prior Bad Acts

■ At trial, Boumis testified about a story Gerard had told him regarding a bad experience he had had in a previous attempt to fly to Colombia on a smuggling venture. When Gerard's plane arrived in Colombia, his group either could not locate the landing strip or the people who were supposed to meet them on the ground were not there. They consequently landed in Aruba and Gerard's pilot's license was confiscated by Aruban officials. A new one was obtained from the FAA in Oklahoma City after Gerard told them his license was lost. The prosecution also introduced the FAA's records of the replacement over Gerard's objection.

Gerard argues that this evidence of other wrongs or acts is inadmissible under Fed.R. Evid. 404(b). We need not repeat the requirements for the admission of such evidence. *United States v. Frederickson, supra*, 601 F.2d at 1365. We merely point out that the evidence of the prior act was relevant to the issue of Gerard's intent, it was clear and convincing and it was close in time to the events for which he was tried. It was incumbent upon the government to prove that Gerard's actions exhibited "deliberate, knowing and specific intent to join the conspiracy," *United States v. Chandler, supra*, 586 F.2d at 599, and evidence of other similar acts is generally admissible as proof of these elements. *United States v.*

---

8. Gerard also adopts Burchinal's arguments as to the scope of cross-examination of Boumis and the *Brady* material. Again we find these arguments unpersuasive for the reasons cited above.

*Young, supra,* 618 F.2d at 1289. The trial judge adequately instructed the jury that the appellant was not on trial for any conduct which was not alleged in the indictment. *Id.* We thus conclude that the evidence was admissible and that its probative value outweighed its unfair prejudicial effect. *See* Fed.R.Evid. 403.

### (2) Prejudicial Publicity

Gerard also raises the argument that he was prejudiced by the newspaper article which was read by the three jurors and that the district court erred in not granting his motion for a mistrial. We have already discussed the merits of this argument and we find it to be unpersuasive for the reasons cited above. In our view, the trial court followed the proper procedures in polling the jurors, and the evidence does not support the claim that the defendants were prejudiced by the article in question.

### (3) Severance

Gerard next contends that the district court's denial of his motion for severance constituted reversible error. We have considered Gerard's allegations of prejudice in light of the standards set forth in *United States v. Smith, supra,* 578 F.2d at 1236. We conclude that there has been no showing of clear prejudice due to the denial of the motion to sever and we find no abuse of the trial court's discretion.

### (4) Directed Verdict

Finally, Gerard claims that the district court erred in not granting his motion for a directed verdict on Count XI, which alleged a violation of the Travel Act. It is argued that Kern's and Gerard's involvement in the conspiracy ended prior to the trip to Peoria, and that their travel to Peoria was not in furtherance of any unlawful activity. The evidence demonstrates, however, that a deal was struck in Peoria whereby the other members of the conspiracy would take title to the airplane which Kern and Gerard had flown there. And the plane was eventually sold to the other members of the conspiracy. Accordingly, we hold that the record does not support Gerard's argument that the conspiracy ended prior to the trip to Peoria.

We have examined the other issues raised by Gerard and find them to be without merit. His conviction therefore is affirmed.

### CONCLUSION

In light of the foregoing, we hold that the convictions of all three appellants must be affirmed. The case is remanded to the district court, however, with orders to reduce the costs assessed against Kern by $220 for the cost of producing the one records custodian who did not testify at trial.